**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **KEITH A. TORREY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:10CV 2271 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Keith A. Torrey for Disability Insurance Benefits under Title II of the

Social Security Act and Supplemental Security Income under Title XVI of the Act.  This case has

been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice

Reform Act and is being heard by consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff has

filed a Brief in Support of the Complaint.  (Document Number 17).  Defendant has filed a Brief in

Support of the Answer.  (Doc. No. 20).

**Procedural History**

On June 29, 2007, plaintiff filed his application for benefits, claiming that he became

unable to work due to his disabling condition on December 1, 2002.[12] (Tr. 99-101). This claim

was denied initially, and following an administrative hearing, plaintiff's claim was denied in a

written opinion by an Administrative Law Judge (ALJ), dated July 20, 2009. (Tr. 62-70, 10-19).

On October 16, 2010, the Appeals Council denied plaintiff's request for review. (Tr. 1-5). Thus,

the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§

404.981, 416.1481.

## **Evidence Before the ALJ**

### A. **ALJ Hearing**

Plaintiff's administrative hearing was held on April 23, 2009. (Tr. 22). Plaintiff was

present and was represented by counsel. (Id.). A vocational expert was also present. (Id.).

The ALJ examined plaintiff, who testified that he had lived alone in a basement-level

apartment for sixteen years. (Tr. 25). Plaintiff stated that he was forty-eight years of age, five-

feet eleven-inches tall, and weighed 390 pounds. (Id.). Plaintiff testified that he was single, and

had no children. (Id.).

Plaintiff stated that his friend drove him to the hearing. (Tr. 26). Plaintiff testified that he

had a driver's license, but he had not driven since he was hospitalized with pneumonia in June

2008. (Id.).

Plaintiff stated that his primary income sources were his brother and his friend. (Id.).

Plaintiff testified that he periodically earned money from music consulting. (Id.). Plaintiff stated

---

[1]In a letter dated April 20, 2008, plaintiff's attorney indicated that plaintiff was amending his alleged onset date of disability to April 24, 2007. (Tr. 180).

[2]Plaintiff's insured status under Title II of the Act expired on September 30, 2007. (Tr. 12, 118, 137).

that he received $200.00 per month in food stamps, and that he received Medicaid benefits. (Id.). Plaintiff testified that he last collected unemployment benefits in 2002 or 2003. (Tr. 27).

Plaintiff stated that he had a high school diploma and attended three years of college, but did not earn a degree. (Id.). Plaintiff testified that he studied social work, business, music, and theater in college. (Id.). Plaintiff stated that he has received on-the-job training in management, crisis prevention, CPR, and conflict resolution. (Tr. 28).

Plaintiff testified that he last worked in 2002 for Grace Hill Neighborhood Health, as part of the AmeriCorps program. (Id.). Plaintiff stated that he did whatever was needed at this position, including assisting at the clinic, reception work, and some neighborhood work. (Tr. 29). Plaintiff testified that he was trained as a health aide at this position, and performed health screenings and assisted patients. (Id.). Plaintiff stated that he worked for this employer for one year, at which time the position ended. (Id.). Plaintiff testified that he lifted up to twenty-five pounds at this position. (Id.).

Plaintiff stated that he did not work at any other jobs since this position ended. (Id.). Plaintiff testified that he applied for other jobs in child care and social work because he was required to look for jobs in order to continue receiving food stamps. (Tr. 30). Plaintiff stated that his health eventually worsened to the extent that he was no longer required to look for jobs. (Id.).

Plaintiff testified that, prior to working for Grace Hill, he worked as a residential treatment manager for Managers of Roman Catholic Orphanage at St. Joseph's Home for Children. (Tr. 31). Plaintiff stated that he supervised child care workers, supervised children, and assisted in facilitating programs at this position. (Id.). Plaintiff testified that he had the ability to hire, and

engage in disciplinary actions with employees. (<u>Id.</u>). Plaintiff stated that he lifted up to thirty-five pounds at the position. (Tr. 33). Plaintiff stated that he worked at the position for five to six years. (Tr. 31). Plaintiff testified that his direct supervisor asked him to resign from the position because they did not get along. (<u>Id.</u>).

Plaintiff testified that he also worked for National Council on Alcoholism as a prevention specialist. (Tr. 33). Plaintiff stated that at this position, he went to various schools and demonstrated the dangers of alcohol and drug abuse. (<u>Id.</u>). Plaintiff testified that he worked at this position for six months, and left because he was terminated. (Tr. 34).

Plaintiff stated that he worked for the Board for Inner City Missions as a social worker for approximately sixteen years. (<u>Id.</u>). Plaintiff testified that he directed the residential treatment summer camp, and worked with families teaching social growth and cultural awareness. (Tr. 35). Plaintiff stated that he taught through activities rather than a textbook. (<u>Id.</u>). Plaintiff testified that he was a child care worker for United Church Neighborhood from 1996 to 1997. (Tr. 36). Plaintiff stated that he lifted about thirty pounds at this position. (<u>Id.</u>).

Plaintiff stated that he worked as a health aide with AmeriCorps from 2001 to 2002. (<u>Id.</u>). Plaintiff testified that he lifted about twenty-five pounds. (<u>Id.</u>).

Plaintiff stated that he was a musician, and that he played keyboard and composed music. (<u>Id.</u>). Plaintiff testified that he did not belong to a music group. (Tr. 37).

Plaintiff stated that on a typical morning, he wakes at approximately 9:00 a.m., takes his medications, and reads magazines or online articles. (Tr. 38). Plaintiff testified that he cooks mostly frozen meals. (<u>Id.</u>). Plaintiff stated that he usually watches television in the morning, and talks to his brother and sister on the telephone. (Tr. 39). Plaintiff testified that he works on

music on the computer when he feels well enough.  (Id.).  Plaintiff stated that in the afternoon, he watches television.  (Id.).

Plaintiff testified that he had friends and that he considered himself sociable.  (Id.).  Plaintiff stated that he did not belong to any clubs or organizations.  (Id.).

Plaintiff testified that his friends and family help him with household chores.  (Id.).  Plaintiff stated that he is able to do laundry, wash dishes, make his bed, and change his sheets.  (Tr. 40).  Plaintiff testified that he is able to vacuum, mop, and sweep "with limits."  (Id.).  Plaintiff stated that he is able to shop for groceries, although he has to take his time and take frequent breaks due to his back pain.  (Id.).  Plaintiff testified that it usually takes him one hour to shop for groceries.  (Id.).

Plaintiff stated that he occasionally goes out to eat and goes to the movies during the evening.  (Id.).  Plaintiff testified that he occasionally goes to the movies with his friend on the weekends.  (Tr. 42).  Plaintiff stated that his only hobby was music.  (Id.).  Plaintiff testified that he did not go outside often and that he was unable to take a walk.  (Id.).

Plaintiff stated that he experienced pain when taking a shower or bath.  (Id.).

Plaintiff testified that he took medication for high blood pressure.  (Tr. 43).  Plaintiff stated that his medications control his high blood pressure.  (Id.).

Plaintiff testified that he has had asthma all his life, and that he takes medication for his asthma.  (Id.).  Plaintiff stated that he has gone to the hospital due to an inability to breathe on two to three occasions in the past five years.  (Tr. 44).  Plaintiff testified that he was allergic to grass, dog hair, cat hair, mold, pollen, trees, and smoke.  (Id.).

Plaintiff stated that he took Alprazolam[3] for anxiety.  (Id.).  Plaintiff testified that he suffered from anxiety and panic attacks.  (Tr. 45).  Plaintiff stated that the medication helps control his anxiety.  (Id.).

Plaintiff testified that he takes Tramadol[4] for pain, which works sometimes.  (Id.).  Plaintiff stated that he also takes Oxycodone[5] every six hours, which works sometimes.  (Id.).

Plaintiff testified that he took aspirin for his heart, and various vitamin supplements.  (Tr. 46).

Plaintiff stated that he took Zometa[6] to help control the lesions from the multiple myeloma.[7]  (Id.).

Plaintiff testified that he had not undergone a bone marrow transplant, although it was possible that he would in the future.  (Id.).

---

[3]Alprazolam is indicated for the treatment of anxiety.  See Physician's Desk Reference (PDR), 2177 (63rd Ed. 2009).

[4]Tramadol is indicated for the management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time.  See PDR at 2429.

[5]Oxycodone is indicated for the management of moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time.  See PDR at 2590.

[6]Zometa is an injection indicated for the treatment of multiple myeloma.  See PDR at 2342.

[7]An uncommon disease that occurs more frequently in men than in women and is associated with anemia, hemorrhage, recurrent infections, and weakness.  Ordinarily, it is regarded as a malignant neoplasm that originates in bone marrow and involves chiefly the skeleton, with clinical features attributable to the sites of involvement and to abnormalities in formation of plasma protein; characterized by numerous diffuse foci or nodular accumulations of abnormal or malignant plasma cells in the marrow of various bones, causing palpable swelling of the bones, and occasionally in extraskeletal sites; radiologically, the bone lesions have a characteristic punched-out appearance.  Stedman's Medical Dictionary, 1269-70 (28th Ed. 2006).

Plaintiff stated that he was diagnosed with multiple myeloma in April of 2007, although he had been experiencing symptoms since 2002. (Id.). Plaintiff testified that he experienced excruciating pain in his side that caused him to go to the emergency room. (Tr. 47). Plaintiff stated that his doctors initially believed the pain was caused by a heart condition. (Id.). Plaintiff testified that his doctors eventually saw the plasmacytoma,[8] which was the source of the pain. (Id.).

Plaintiff stated that he has undergone chemotherapy, but not radiation. (Id.). Plaintiff testified that the chemotherapy made him tired, sick to his stomach, and caused him to lose weight. (Tr. 47-48). Plaintiff stated that the chemotherapy also caused tingling in his hands and feet. (Tr. 48).

Plaintiff testified that he experienced continuous infections and outbreaks of boils all over his body. (Id.). Plaintiff stated that he had pneumonia in June of 2008, and that he was in a coma for a few weeks as a result of the pneumonia. (Id.). Plaintiff testified that he was in intensive care for three weeks, a regular room for one week, and then a rehabilitation hospital for over a month. (Tr. 49).

Plaintiff stated that the cancer was in remission at the time of the hearing, although he had started experiencing pain since he was told the cancer was in remission. (Id.). Plaintiff testified that he had pain in his spine, knee, and hip. (Tr. 50). Plaintiff stated that his pain level ranged from a seven to a ten on a scale of one to ten. (Id.). Plaintiff testified that the Oxycodone brings his pain level down to a five or six. (Id.).

_____

[8]A discrete, presumably solitary mass of neoplastic plasma cells in bone, around the spinal cord, or outside the bone marrow; such lesions are probably the initial phase of developing plasma cell myeloma. Stedman's at 1506.

Plaintiff stated that he was considering undergoing a bone marrow transplant in August. (Id.). Plaintiff testified that he would be hospitalized for at least a month for the transplant. (Tr. 51).

Plaintiff stated that he had not been diagnosed with depression, although he believed he was depressed. (Id.). Plaintiff testified that he had never been under psychiatric care, nor had he ever been hospitalized for psychiatric impairments. (Id.). Plaintiff stated that he was not suicidal. (Id.). Plaintiff testified that he cried periodically. (Id.). Plaintiff testified that his concentration was "at times..okay." (Id.).

Plaintiff stated that he had difficulty sitting in a chair due to pain. (Tr. 52). Plaintiff testified that, at home, he usually sits and lies down. (Id.). Plaintiff stated that he was able to stand for about five minutes. (Id.). Plaintiff testified that he was able to walk for about half a block without pain. (Id.). Plaintiff stated that he was able to lift about five pounds. (Id.). Plaintiff testified that he was able to pour himself a glass of milk. (Id.). Plaintiff stated that he was unable to bend, stoop, crouch, kneel, or crawl. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that he composed music when he felt well enough. (Tr. 53). Plaintiff stated that he occasionally sold the music he composed. (Id.). Plaintiff testified that he spent approximately three to four hours in an average week composing music. (Tr. 54). Plaintiff stated that he earned approximately $250.00 a month composing music. (Id.).

Plaintiff testified that he had been at his current weight for about five years, although he lost some weight during chemotherapy and during his hospitalization. (Id.).

Plaintiff stated that he did not sleep well due to pain. (Id.). Plaintiff testified that he slept

approximately six hours a night, although his sleep was interrupted. (Id.). Plaintiff stated that he was unable to sleep during the day. (Id.).

Plaintiff testified that his energy level was low. (Id.). Plaintiff stated that he gets tired quickly when he is involved in activities, such as composing music. (Tr. 55).

Plaintiff testified that he occasionally experienced difficulty concentrating. (Id.). Plaintiff stated that he worried a lot about his health and his future. (Id.).

The ALJ then examined the vocational expert, Vincent Stock. (Tr. 58). The ALJ asked Mr. Stock to assume a hypothetical claimant with the following limitations: capable of lifting ten pounds occasionally and less then ten pounds frequently; sitting six out of eight hours, and standing and walking for two out of eight hours; occasionally climbing, balancing, stooping, crouching, kneeling, or crawling; no exposure to ladders, ropes, or scaffolds; and no concentrated exposure to dust, fumes, and gases. (Id.). Mr. Stock testified that the claimant could perform plaintiff's past work as a residential treatment manager and social group worker as they are available in the national economy but not as plaintiff performed them. (Tr. 59). Mr. Stock stated that the individual could also perform work as a security guard monitor (320,000 positions nationally, 8,000 positions in Missouri); and cashier (320,000 positions nationally, 8,000 positions in Missouri). (Tr. 60).

Plaintiff's attorney then asked Mr. Stock to assume an individual with the following limitations: able to lift no more than five pounds occasionally; needs frequent rest periods throughout the day; requires an irregular on demand schedule; and whose ability to maintain attention and concentration is significantly limited for periods throughout an eight-hour stretch due to fatigue and pain. (Id.). Mr. Stock testified that such an individual would be unable to

perform any job.  (Id.).

The ALJ indicated that he would order a consultative internal medicine examination of plaintiff.  (Id.).

**B.**     **Relevant Medical Records**

The record reveals that plaintiff received treatment from Dr. Vani Pachalla at Grace Hill Neighborhood Health Centers for various impairments, including hypertension, chest pain, obesity, and right upper quadrant pain, from May 2006 through April 2007.  (Tr. 195-221).  Plaintiff complained of chest pain on April 12, 2007.  (Tr. 196).  Plaintiff underwent a chest x-ray, which revealed a mass.  (Tr. 195).

Plaintiff saw Joshua Field, M.D. at the Washington University School of Medicine-Siteman Cancer Center (WUSM-SCC), Division of Hematology on July 19, 2007.  (Tr. 283-84).  Dr. Field indicated that plaintiff had recently been diagnosed with plasmacytoma and presented for an evaluation.  (Tr. 283).  Plaintiff reported that he had experienced left back pain for a few months, and in April 2007 plain films demonstrated an extensive lytic lesion[9] in the seventh left rib.  (Id.).  Dr. Field indicated that plaintiff subsequently underwent a CT-guided biopsy, which was consistent with a plasmacytoma.  (Id.).  Plaintiff reported feeling well, although he noted occasional pain in the area of the lesion.  (Id.).  Dr. Field's impression was plasmacytoma.  (Id.).  He indicated that further testing was necessary to determine whether it was a solitary plasmacytoma or multiple myeloma. (Id.).

_____

[9]Destruction of an area of bone that is caused by either a malignant or benign disease.  See Stedman's at 1137.

Plaintiff saw Morey Blinder, M.D. at the WUSM-SCC, Division of Hematology on August 16, 2007. (Tr. 281). Dr. Blinder indicated that plaintiff had undergone an extensive work-up, which revealed a plasma cell dyscrasia[10] of his bone marrow with atypical large plasma cell comprising ten percent of the marrow cellularity that showed a kappa-restricted population. (Id.). Dr. Blinder noted that plaintiff had also undergone a skeletal survey, which revealed several lytic lesions including the skull, right clavicle, left seventh rib, and L5 vertebral body, right iliac groin, and right femoral neck. (Id.). Dr. Blinder stated that plaintiff had pain in most of the areas that were found to have lytic lesions. (Id.). Plaintiff also continued to have some left-sided pain that he noted began five years prior. (Id.). Dr. Blinder's assessment was plasmacytoma as well as bone marrow abnormalities and additional lytic lesions consistent with a diagnosis of multiple myeloma. (Id.). Dr. Blinder recommended initial therapy with thalidomide,[11] Decadron,[12] Aranesp,[13] and Zometa. (Id.). He indicated that chemotherapy would be initiated as soon as possible. (Id.). Dr. Blinder noted that a bone marrow transplant would be also be possible in the future. (Id.).

Dr. Blinder completed a medical source statement on September 4, 2007, in which he indicated that he started treating plaintiff for multiple myeloma in July 2007, and that he had last seen

---

[10]A diverse group of diseases characterized by the proliferation of a single clone of cells producing a monoclonal immunoglobulin. Stedman's at 596.

[11]Thalidomide is indicated for the treatment of multiple myeloma. See WebMD, http://www.webmd.com/drugs (last visited February 17, 2012).

[12]Decadron is a corticosteroid hormone indicated for the treatment of cancer. See WebMD, http://www.webmd.com/drugs (last visited February 1, 2012).

[13]Aranesp is indicated for the treatment of anemia caused by chemotherapy. See PDR at 565.

plaintiff on August 16, 2007. (Tr. 280). Dr. Blinder stated that plaintiff was markedly limited in his ability to perform work-related functions. (Id.). Dr. Blinder noted that plaintiff would be receiving chemotherapy as well as radiation therapy. (Id.).

The record reveals that plaintiff underwent induction chemotherapy at Barnes-Jewish Hospital September 17, 2007, through September 23, 2007; and October 28, 2007, through November 2, 2007. (Tr. 299-304).

Plaintiff saw Dr. Blinder for follow-up on October 25, 2007, at which time Dr. Blinder indicated that plaintiff had tolerated chemotherapy well and denied any significant symptoms. (Tr. 593). Plaintiff reported that his right shoulder and back pain had gotten progressively worse. (Id.). Dr. Blinder indicated that plaintiff had been requiring Percocet[14] daily, and that he had had difficulty sleeping. (Id.). On November 29, 2007, Dr. Blinder indicated that plaintiff's second cycle of chemotherapy was complicated by severe malaise. (Tr. 590). Plaintiff recovered from this malaise and indicated that his bone pain would go in cycles. (Id.).

Dennis McGraw, D.O., a non-examining state agency physician, completed a Physical Residual Functional Capacity Assessment on November 30, 2007. (Tr. 312-17). Dr. McGraw expressed the opinion that plaintiff could occasionally lift or carry ten pounds, frequently lift less than ten pounds, stand or walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday, and occasionally climb, balance, stoop, kneel, crouch, and crawl. (Id.).

On January 3, 2008, plaintiff was admitted at Barnes-Jewish Hospital with fever and line

---

[14]Percocet is indicated for the relief of moderate to moderately severe pain. See PDR at 1127.

infection following chemotherapy. (Tr. 360). Plaintiff had been discharged on December 17, 2007, after receiving his third cycle of chemotherapy. (Id.). It was noted that plaintiff had had previous urinary tract infections. (Tr. 361). Plaintiff was given antibiotics and was discharged on January 7, 2008. (Tr. 363).

Plaintiff saw Dr. Blinder on January 10, 2008, at which time plaintiff was "doing well," and denied any significant symptoms. (Tr. 588). Due to plaintiff's recent line infection, Dr. Blinder started plaintiff on thalidomide and Decadron. (Id.). Dr. Blinder indicated that he would consider a stem cell transplant in the future. (Tr. 589). On February 7, 2008, plaintiff reported a "pain cycle," involving morning stiffness, decreased muscle strength, and a vague feeling of pain. (Tr. 586). Dr. Blinder found that plaintiff was tolerating the thalidomide and Decadron "fairly well." (Id.). On March 6, 2008, plaintiff reported increased fatigue and increased swelling since starting thalidomide. (Tr. 584). Plaintiff received Zometa and was continued on his medication regimen. (Id.). On April 3, 2008, plaintiff complained of symptoms of a cold and noted a slight increase in his back pain. (Tr. 582). It was noted that plaintiff had undergone a skeletal survey on April 2, 2008, which revealed an unchanged lytic lesion involving the skull, right clavicle, left seventh rib, and L2 and L5 vertebral bodies, and a right iliac wing; and a lytic lesion in the superior endplate of L2, which had increased in size compared to the prior exam and extending into the posterior elements. (Id.). Plaintiff was diagnosed with hypertension and was continued on his regimen of medication therapy. (Id.). On May 1, 2008, it was noted that plaintiff was tolerating thalidomide "reasonably well," but had some complaints of mild lower extremity swelling, constipation, and rib pain. (Tr. 580). Plaintiff's dosage of thalidomide was increased. (Id.). On May 29, 2008, it was noted that plaintiff continued to have back pain due to the progression of the lytic lesions in the lumbar spine, which was managed with

Percocet. (Tr. 578). It was also noted that plaintiff was morbidly obese. (Id.). Plaintiff was referred to the Bone Marrow Transplant Service for consultation regarding a transplant as a future treatment option. (Id.).

Plaintiff saw Nancy C. Higgins, Ph.D., Missouri Licensed Psychologist, on July 22, 2008, for a psychological consultation. (Tr. 515-17). It was noted that plaintiff was currently receiving acute rehabilitation services for functional impairment in mobility and activities of daily living. (Tr. 515). Plaintiff reported middle insomnia and hypersomnia during the day. (Id.). Plaintiff rated his energy as low to moderately low. (Id.). Plaintiff denied problems with concentration or memory. (Id.). Plaintiff reported occasional depression; some irritability; and episodes of anxiety, including panic attacks, which had not occurred in two years. (Id.). Dr. Higgins found that plaintiff exhibited a number of symptoms of depression, including middle insomnia, hypersomnia, decreased energy, variable motivation, moments of depression, and some irritability. (Tr. 516). Dr. Higgins indicated that plaintiff had not faced all of the implications of having multiple myeloma, including the possibility that the disease may take his life. (Id.). Dr. Higgins diagnosed plaintiff with adjustment disorder[15] with depressed mood and assessed a GAF[16] score of 57.[17] (Id.).

---

[15]A group of mental and behavioral disorders in which the development of symptoms is related to the presence of some environmental stressor or life event and is expected to remit when the stress ceases. Stedman's at 567.

[16]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[17]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

On August 6, 2008, Dr. Blinder noted that plaintiff was taken off his medication therapy due to an episode of life-threatening pneumonia on June 24, 2008,which required a prolonged hospital stay. (Tr. 576). Plaintiff complained of fatigue and chronic back pain. (Id.). Plaintiff's medication therapy was resumed. (Id.). On September 4, 2008, it was noted that plaintiff was treated for bilateral armpit abscesses but was otherwise feeling well. (Tr. 574). On October 2, 2008, plaintiff reported occasional numbness and tingling of the bilateral toes, which did not affect his activities of daily living. (Id.). It was noted that plaintiff would be referred to the stem cell transplant service for evaluation of a potential transplant. (Id.). On November 6, 2008, plaintiff was doing well, and reported that his previously described mild lower extremity numbness and tingling had resolved. (Tr. 570). On December 4, 2008, plaintiff reported feeling well overall but acknowledged difficulty with weight reduction. (Tr. 568). Plaintiff continued to use Percocet on an infrequent basis for relief of back pain. (Tr. 568, 564, 562). On January 7, 2009, plaintiff was tolerating therapy well and complained only of recent bronchitis treated by his primary care provider. (Tr. 566). It was noted that plaintiff had been referred to Dr. Geoffrey Uy for a consultation regarding bone marrow transplantation. (Id.).

Plaintiff saw Dr. Uy at Washington University School of Medicine's Bone Marrow Transplant Section on March 16, 2009. (Tr. 604-05). Plaintiff complained of left knee pain that was exertional in nature, but was otherwise doing well. (Tr. 604). Dr. Uy's impression was multiple myeloma, with a very good partial response to induction therapy with thalidomide and dexamethasone. (Id.). Dr. Uy indicated that, due to plaintiff's obesity, he would be at an increased risk for complications with stem cell transplant. (Id.). Dr. Uy stated that he would harvest plaintiff's stem cells to store them for future use, and defer treatment until the time of progression as plaintiff was doing "quite well right

now and is asymptomatic." (Tr. 605). Dr. Uy also recommended that plaintiff continue to stay off medication therapy, as it appeared that plaintiff had reached a plateau in terms of response. (Id.).

Vani Pachalla, M.D., plaintiff's primary care physician, completed a form entitled "Physician's Assessment for Social Security Disability Claim" on April 4, 2009. (Tr. 540). Dr. Pachalla indicated that plaintiff had diagnoses of multiple myeloma, obesity, chest wall pain, and shortness of breath. (Id.). Dr. Pachalla stated that plaintiff would need to rest every two to three hours in an eight-hour workday due to his impairments. (Id.). Dr. Pachalla expressed the opinion that plaintiff was not capable of performing sedentary work on a sustained full-time basis, and that plaintiff became disabled on or before September 30, 2007. (Id.).

Dr. Blinder completed a Physician's Assessment for Social Security Disability Claim on April 14, 2009. (Tr. 561). Dr. Blinder indicated that plaintiff had diagnoses of multiple myeloma treated with chemotherapy and evaluated for bone marrow transplant; recent viral pneumonia; morbid obesity; and bone pain with lytic lesions from multiple myeloma. (Id.). Dr. Blinder stated that plaintiff was limited to working four hours in an eight-hour workday due to the multiple myeloma and obesity. (Id.). Dr. Blinder expressed the opinion that it was "doubtful" that plaintiff could have performed sedentary work on a sustained full-time basis since September 30, 2007. (Id.). Dr. Blinder noted that plaintiff was limited in most activities by his obesity and the bone pain from his multiple myeloma. (Id.). Dr. Blinder stated that plaintiff was also limited somewhat by fatigue from chemotherapy. (Id.). Dr. Blinder noted that plaintiff's condition was first diagnosed in June of 2007. (Id.).

Plaintiff underwent an MRI of the left knee on May 1, 2009, which revealed a severe

patellofemoral and moderate lateral compartment chondrosis;[18] and a radial tear of the inner margin posterior horn medial meniscus.[19]  (Tr. 658).

Plaintiff underwent a chest x-ray on May 20, 2009, which revealed a bony lesion on the left seventh rib as well as right clavicle, possibly relating to plaintiff's clinical history of multiple myelomas.  (Tr. 654).

Plaintiff presented to Raymond Leung, M.D. for an internist examination on May 26, 2009. (Tr. 641-44).  It was noted that plaintiff used a cane to help him walk due to pain.  (Tr. 641). Plaintiff was morbidly obese at 393 pounds.  (Tr. 642).  Upon examination, plaintiff had decreased breath sounds with scattered rhonchi.[20]  (Tr. 643).  Plaintiff's gait was significant for a mild limp with his cane, and a mild-to-moderate limp without his cane.  (Id.).  Plaintiff was able to walk fifty feet unassisted, tandem walk, squat one quarter of the way down, and had no difficulty getting on and off the exam table.  (Id.).  Plaintiff indicated that he was not able to hop, or walk on his heels or toes, and did not make an attempt to do so.  (Id.).  Plaintiff had decreased range of motion in his knees, neck, and lumbar spine.  (Id.).  Plaintiff's straight leg raising was limited to forty degrees bilaterally.  (Id.). No muscle atrophy or spasms were noted.  (Id.).  Dr. Leung's impression was multiple myeloma, morbid obesity, asthma, sleep apnea, and hypertension.  (Tr. 643-44).  Dr. Leung indicated that plaintiff was taking thalidomide for his multiple myeloma and that plaintiff complained of body pain.

---

[18]Softening of the cartilage.  See Stedman's at 369.

[19]A tear of the inner side of the knee, from the edge of the cartilage inwards.  See Stedman's at 1184.

[20]An added sound with a musical pitch occurring during inspiration or expiration, heard on ausculation of the chest and caused by air passing through bronchi that are narrowed by inflammation, spasm of smooth muscle, or presence of mucus in the lumen.  Stedman's at 1693.

(Tr. 643). Dr. Leung noted that plaintiff had difficulties moving about, although this may be in part related to his morbid obesity. (Id.). Dr. Leung found that plaintiff could occasionally lift and carry up to twenty pounds, sit for eight hours a day, stand for two hours, and walk for one hour in an eight-hour workday with the use of a cane to ambulate. (Tr. 646). Dr. Leung also found that plaintiff should never climb stairs and ramps; climb ladders or scaffolds; be exposed to unprotected heights, moving mechanical parts, dust, odors, fumes, or pulmonary irritants; or operate a motor vehicle. (Tr. 648-49).

**B.** **Evidence Submitted to the Appeals Council**

In a letter dated September 18, 2009, addressed to "To Whom It May Concern," Dr. Blinder states that he has been treating plaintiff since his initial diagnosis of multiple myeloma in July 2007. (Pl's Ex. A). Dr. Blinder states that multiple myeloma is a malignancy of the plasma cells leading to many complications including bone marrow disease, bone damage, and immune suppression among other organ disease. (Id.). Dr. Blinder indicates that the disease is rarely curable and often requires long-term therapy. (Id.). Dr. Blinder states that, at that time, plaintiff was being maintained on oral chemotherapy and his disease is best classified as being in partial remission. (Id.). Dr. Blinder indicated that plaintiff had stem cells harvested in March 2009 for the possibility of transplantation, although Dr. Uy determined that the risk of a transplant at that time exceeded the benefit. (Id.). Dr. Blinder stated that the "lack of treatment with a stem cell transplant is not indicative of the fact that plaintiff's disease is any milder or less concerning than other patients with active multiple myeloma." (Id.). Dr. Blinder expressed the opinion that plaintiff was disabled for the following reasons: (1) plaintiff was receiving ongoing chemotherapy for multiple myeloma, which was anticipated to continue long-term and it was likely that he wold be re-evaluated for a stem cell transplant; (2)

multiple myeloma along with ongoing treatment represents an immune deficient state and plaintiff is at ongoing risk for life-threatening infection similar to the pneumonia that he experienced previously; (3) plaintiff has morbid obesity with an estimated BMI of 57, which was due at least in part to his ongoing chemotherapy, and the corticosteroids contribute to his inability to lose weight; and (4) plaintiff is limited by left knee pain and this has been confirmed by a recent MRI showing a meniscal tear and severe chondrosis. (Id.). Dr. Blinder indicated that plaintiff's knee pain was unrelated to his multiple myeloma but was physically limiting and required ongoing treatment with chronic opioids. (Id.). Dr. Blinder expressed the opinion that even sedentary work would be precluded due to the effect of plaintiff's use of opioids on his cognitive ability and ability to concentrate. (Id.). Dr. Blinder stated that the fact that plaintiff had not been referred to a pain management specialist was not indicative of the fact that he has a serious chronic pain syndrome, noting that plaintiff's pain was being actively managed in the Division of Hematology. (Id.). Finally, Dr. Blinder pointed out that "muscle atrophy, persistent or frequently recurring muscle spasms, obvious or consistently reproducible neurologic defects, or other signs of nerve root impingement" were not always observed despite serious and limiting pain. (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.     The claimant met the special earnings requirements of the Act as of December 1, 2002, the alleged onset of disability, and continued to meet them through September 30, 2007, but not thereafter.

2.     The claimant has not engaged in substantial gainful activity since December 1, 2002.

3.     The medical evidence establishes that the claimant has obesity, multiple myeloma in remission, recent onset torn medial meniscus of the left knee, and hypertension and asthma controlled by medication, but no impairment or combination of impairments

that meets or equals in severity the requirements of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

4.     The claimant's allegation and that of another witness of impairments, either singly or in combination, producing symptoms and limitations of sufficient severity to prevent the performance of any sustained work activity by the claimant are not credible for the reasons set out in the body of this decision.

5.     The claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except for prolonged or frequent standing or walking; lifting or carrying objects weighing more than 10 pounds; climbing of ropes, ladders or scaffolds; more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, or crawling; and no concentrated or excessive exposure to dust, fumes, chemicals, temperature extremes, high humidity or dampness, and other typical allergens pollutants, and atmospheric irritants. There are no credible, medically-established mental impairments or mental or other nonexertional limitations (20 CFR 404.1545 and 416.945).

6.     The claimant's past relevant work as a social worker and residential treatment manager did not require the performance of work-related activities precluded by the limitations described in Finding No. 5 (20 CFR 404.1565 and 416.965). The impairments established in this case do not prevent the claimant from performing this past relevant work, according to vocational expert opinion.

7.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through September 30, 2007 or the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 18).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the applications filed on June 8, 2007, the claimant is not entitled to a period of disability or to disability insurance benefits under Sections 216(I) and 223, respectively, of the Social Security Act; and is not eligible for supplemental security income under Sections 1602 and 1614(a)(3)(A) of the Act.

(Tr. 19).

## Discussion

### A.  Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

### B.  The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir.

1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to

perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758. Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss

resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. <u>See</u> 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. <u>See id.</u> Next, the Commissioner must determine the severity of the impairment based on those ratings. <u>See</u> 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. <u>See</u> 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. <u>See id.</u> If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. <u>See</u> 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.  <u>Plaintiff's Claims</u>

Plaintiff first argues that the ALJ erred in failing to properly evaluate the medical opinion evidence. Plaintiff also argues that the Appeals Council failed to properly evaluate new and material evidence. The undersigned will discuss plaintiff's claims in turn.

## 1.  <u>Medical Opinion Evidence</u>

Plaintiff first argues that the ALJ failed to afford controlling weight to the opinion of plaintiff's treating hematologist, Dr. Blinder, and primary care physician, Dr. Pachalla, in determining plaintiff's residual functional capacity.

Determination of residual functional capacity ("RFC") is a medical question and at least "some medical evidence 'must support the determination of the claimant's [RFC] and the ALJ should obtain

medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of RFC is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of RFC, an ALJ may consider non-medical evidence, although the RFC finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

The ALJ made the following determination regarding plaintiff's RFC:

The claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except for prolonged or frequent standing or walking; lifting or carrying objects weighing more than 10 pounds; climbing of ropes, ladders or scaffolds; more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, or crawling; and no concentrated or excessive exposure to dust, fumes, chemicals, temperature extremes, high humidity or dampness, and other typical allergens pollutants, and atmospheric irritants. There are no credible, medically-established mental impairments or mental or other nonexertional limitations (20 CFR 404.1545 and 416.945).

(Tr. 18).

Plaintiff first argues that the ALJ should have afforded controlling weight to the opinion of plaintiff's treating hematologist Dr. Blinder. In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). Further, a treating physician's opinion will typically be given controlling weight when the opinion is

"well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). Such opinions, however, do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).

Whatever weight the ALJ accords the treating physician's report, be it substantial or little, the ALJ is required to give good reasons for the particular weight given the report. See Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). The ALJ, however, is not required to discuss every piece of evidence submitted. See Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998). If the opinion of a treating physician is not well supported or is inconsistent with other evidence, the ALJ must consider: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by the relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered, and (6) other factors which may contradict or support the opinion. See Rhodes, 40 F. Supp.2d at 1119; 20 C.F.R. § 404.1527 (d)(2)-(6).

The ALJ cited the opinions of Drs. Blinder and Pachalla and found that "[t]hese form assessments, which were done strictly for litigation purposes, are credible only to the extent that they restrict the claimant to sedentary work, but not credible to the extent that they rule out sedentary

work." (Tr. 16). The ALJ noted that Dr. Blinder's own treatment notes always indicated that plaintiff was "doing pretty well in light of his underlying conditions and his chemotherapy," and that plaintiff's own description of his daily activities was consistent with the performance of sedentary work. (Id.).

Dr. Blinder completed a Physician's Assessment for Social Security Disability Claim on April 14, 2009. (Tr. 561). Dr. Blinder indicated that plaintiff had diagnoses of multiple myeloma treated with chemotherapy and had been evaluated for bone marrow transplant; recent viral pneumonia; morbid obesity; and bone pain with lytic lesions from multiple myeloma. (Id.). Dr. Blinder stated that plaintiff was limited to working four hours in an eight-hour workday due to the multiple myeloma and obesity. (Id.). Dr. Blinder expressed the opinion that it was "doubtful" that plaintiff could have performed sedentary work on a sustained full-time basis since September 30, 2007. (Id.). Dr. Blinder noted that plaintiff was limited in most activities by his obesity and the bone pain from his multiple myeloma. (Id.). Dr. Blinder stated that plaintiff was also limited somewhat by fatigue from chemotherapy. (Id.).

The undersigned finds that the ALJ erred in discrediting Dr. Blinder's opinion. The ALJ indicated that he was discrediting Dr. Blinder's opinion, in part, because it was provided "strictly for litigation purposes." (Tr. 16). Dr. Blinder is a specialist in hematology at Washington University School of Medicine, and had treated plaintiff since August 2007. Plaintiff saw Dr. Blinder or one of his colleagues approximately monthly for treatment of his multiple myeloma, which included chemotherapy. Dr. Blinder was not merely a one-time consultant to which plaintiff was referred by his attorney. Further, as plaintiff points out, the Social Security Act and relevant regulations place upon plaintiff the burden of proving he suffers from a disabling impairment. See 42 U.S.C. §

423(d)(5)(A); 404.1512(a). The law, therefore, expects that a claimant will obtain opinions from physicians, treating or consulting, in an effort to meet this burden. As such, the ALJ erred in discrediting Dr. Blinder's opinion on the basis that it was provided for litigation purposes.

The ALJ also indicated that he was discrediting Dr. Blinder's opinion because it was inconsistent with his own treatment notes. Specifically, the ALJ noted that Dr. Blinder's treatment notes always indicated that plaintiff was "doing pretty well in light of his underlying conditions and his chemotherapy." (Tr. 16). While it is true that Dr. Blinder consistently noted that plaintiff was doing well, a finding that a cancer patient undergoing chemotherapy is doing well is not inconsistent with an opinion that the patient is unable to work. On September 4, 2007, Dr. Blinder indicated that plaintiff was markedly limited in his ability to perform work-related functions. (Tr. 280). Dr. Blinder's treatment notes reveal that plaintiff frequently complained of bone pain, for which Dr. Blinder prescribed Percocet, a narcotic pain-reliever. (Tr. 593, 590, 586, 580, 578). Plaintiff also complained of fatigue. (Tr. 584, 576). Plaintiff suffered a life-threatening episode of pneumonia in June 24, 2008, which required a prolonged hospital stay and rehabilitation. (Tr. 576). Dr. Blinder referred plaintiff to a specialist regarding a bone marrow transplant. (Tr. 574). The ALJ's finding that Dr. Blinder's treatment notes were inconsistent with his opinion is not supported by substantial evidence. As a treating specialist in hematology, the area on which he provided an opinion, Dr. Blinder's opinion was entitled to controlling weight. Further, Dr. Blinder's letter dated September 21, 2009, which plaintiff submitted to the Appeals Council, provides additional support for his opinion.

Plaintiff also argues that the ALJ erred in discrediting the opinion of Dr. Pachalla. Dr. Pachalla completed a Physician's Assessment for Social Security Disability Claim on April 4, 2009.

- 28 -

(Tr. 540). Dr. Pachalla indicated that plaintiff had diagnoses of multiple myeloma, obesity, chest wall pain, and shortness of breath. (Id.). Dr. Pachalla stated that plaintiff would need to rest every two to three hours in an eight-hour workday due to his impairments. (Id.). Dr. Pachalla expressed the opinion that plaintiff was not capable of performing sedentary work on a sustained full-time basis, and that plaintiff became disabled on or before September 30, 2007. (Id.).

The ALJ discredited Dr. Pachalla's opinion on the same bases as he discredited Dr. Blinder's opinion. Dr. Pachalla was plaintiff's treating primary care physician, and saw plaintiff regularly since May 2006 for various impairments. (Tr. 195-221). As such, the ALJ also erred in discrediting Dr. Pachalla's opinion on the basis that it was provided for litigation purposes. The ALJ also found that Dr. Pachalla's opinion was inconsistent with his treatment records. Although Dr. Pachalla's treatment records do not provide much detail, the ALJ could have contacted Dr. Pachalla to obtain clarification regarding his opinion. Further, Dr. Pachalla's opinion is consistent with the opinion of plaintiff's treating hematologist, Dr. Blinder.

After improperly discrediting the opinions of plaintiff's treating physicians, the ALJ appeared to rely on the opinions of a one-time consulting physician and a non-examining state agency physician. Plaintiff saw Dr. Leung for an internist examination on May 26, 2009, after the hearing. (Tr. 641-44). Dr. Leung found that plaintiff could occasionally lift and carry up to twenty pounds, sit for eight hours a day, stand for two hours, and walk for one hour in an eight-hour workday with the use of a cane to ambulate. (Tr. 646). Dr. Leung also found that plaintiff should never climb stairs and ramps; climb ladders or scaffolds; be exposed to unprotected heights, moving mechanical parts, dust, odors, fumes, or pulmonary irritants; or operate a motor vehicle. (Tr. 648-49). Dennis McGraw, D.O., a non-examining state agency physician, completed a Physical Residual Functional

Capacity Assessment on November 30, 2007. (Tr. 312-17). Dr. McGraw expressed the opinion that plaintiff could occasionally lift or carry ten pounds, frequently lift less than ten pounds, stand or walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday, and occasionally climb, balance, stoop, kneel, crouch, and crawl. (Id.).

As plaintiff points out, the ALJ did not indicate the weight he was assigning to the opinions of Drs. Leung and McGraw. The ALJ, however, appeared to rely on these opinions in determining plaintiff's residual functional capacity RFC. "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." Kelley, 133 F.3d at 589.

The undersigned finds that the ALJ's assessment of plaintiff's residual functional capacity is not supported by substantial evidence. The ALJ did not provide any support for his determination. The ALJ improperly discredited the opinions of plaintiff's treating hematologist and treating primary care provider. Significantly, both of these treating physicians found that plaintiff was more limited than the RFC formulated by the ALJ. The ALJ then appeared to rely on the opinions of a one-time consulting physician and a non-examining physician, without indicating the weight given to these opinions.

## 2.    New Evidence

Plaintiff also argues that the Appeals Council failed to properly evaluate new and material evidence submitted with plaintiff's brief. Specifically, plaintiff contends that the Appeals Council ignored the letter from plaintiff's treating hematologist, Dr. Blinder, dated September 17, 2009.

Title 20 C.F.R. § 416.1476(b) provides that "[i]n reviewing decisions based on an application for benefits, the Appeals Council will consider the evidence in the [ALJ] hearing record and any new

and material evidence only if it relates to the period on or before the date of the [ALJ] hearing decision." "To be 'new,' evidence must be more than merely cumulative of other evidence in the record." Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000). "To be 'material,' the evidence must be relevant to [the] claimant's condition for the time period for which benefits were denied." Id.

In its order denying plaintiff's request for review, the Appeals Council does not refer to the new evidence from Dr. Blinder. (Tr. 1-5).

In Lamp v. Astrue, 531 F.3d 629 (8th Cir. 2008), the Appeals Council's decision noted that it had considered a dated exhibit as new evidence but did not specify whether that exhibit included an undated letter that was also submitted. Id. at 632. This undated letter included an explanation that the ALJ had requested. Id. at 633. The case was remanded to the district court with instructions to remand it to the Appeals Council because the court was "unable to discern whether the Appeals Council considered this new and material evidence." Id. Further, in Gartman v. Apfel, 220 F.3d 918, 922 (8th Cir. 2000), a case was remanded to the district court with instructions to remand it to the Appeals Council when the Council's decision simply referred to "additional evidence" but did not specify whether that additional evidence included a doctor's new and material evidence that had been submitted to the Council after the ALJ's adverse decision.

Dr. Blinder's letter dated September 17, 2009 is clearly new. The undersigned finds that this evidence is also material. In his letter, Dr. Blinder provides a detailed explanation of his opinion regarding plaintiff's ability to work with his impairments during the relevant period. This evidence is significant because the ALJ discredited Dr. Blinder's opinion based, in part, on a finding that it was inconsistent with his treatment notes. In his letter, Dr. Blinder attempts to reconcile any discrepancies

between his treatment notes and his opinion.  Because the evidence from Dr. Blinder is both new and material and because it cannot be determined whether the Appeals Council considered this evidence, the case must be reversed and remanded to the ALJ.

## Conclusion

In sum, the ALJ erred in discrediting the opinions of plaintiff's treating hematologist and treating primary care physician, and formulating a residual functional capacity that was not based on substantial evidence.  For these reasons, this cause will be reversed and remanded to the ALJ in order for the ALJ to consider new evidence from Dr. Blinder; assign the proper weight to the opinions of Drs. Blinder and Pachalla; indicate the weight he is assigning to the opinion of the consulting physician and state agency physician; and formulate a new residual functional capacity for plaintiff based on the medical evidence in the record.  Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this  _15th_  day of March, 2012.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE